897 F.2d 773
 58 USLW 2598, 1990-1 Trade Cases 68,983,
16 Fed.R.Serv.3d 122
 TRANS WORLD AIRLINES, INC., et al., Plaintiffs-Appellees,
v.
Jim MATTOX, Attorney General of the State of Texas,
Defendant-Appellant.
TRANS WORLD AIRLINES, INC., et al., Plaintiffs-Appellees,
v.
Jim MATTOX, Attorney General of the State of Texas, et al.,
Defendants-Appellants.
TRANS WORLD AIRLINES, INC., et al., Plaintiffs-Appellees,
Pan American World Airways, Intervening-Plaintiff-Appellee,
v.
Jim MATTOX, Attorney General of the State of Texas, et al.,
Defendants-Appellants.
 Nos. 89-1142, 89-1509 and 89-1610.
 United States Court of Appeals,
Fifth Circuit.
 April 3, 1990.
 
 Stephen Henry Gardner and Craig Jordan, Asst. Attys. Gen., Dallas, Tex., Albert Norman Shelden, Deputy Atty. Gen., San Diego, Cal., for defendants-appellants.
 Ronald D. Secrest, David Wilks Corban, Richard J. Wilson, Rene P. Lavenant, Jr., Fulbright & Jaworski, Houston, Tex., Andrew C. Freedman, Fulbright Jaworski & Reavis, Mc Grath, New York City, Gregory W. Buhler, New York City, Frederick D. Bostwick, III, Waco, Tex., for plaintiff-appellees. Mary MaGuire Voog and Mark Asron Buckstein, Mt. Kisco, N.Y., for Trans World Airlines, Inc., et al.
 Mark McCall, John W. Dickey and David Feher, Sullivan & Cromwell, New York City, Karen K. Crider, British Airways Legal Dept., Jackson Heights, New York City, for British Airways.
 John Williams, Houston, Tex., for Continental Airlines.
 Melvin L. Goldberg, Andrea C. Levine and Ronna D. Brown, N.Y. Dept. of Law, New York City, amicus curiae for 38 States.
 Gregory W. Buhler, New York City, for Pan American World Airways.
 Appeals from the United States District Court for the Western District of Texas.
 Before LIVELY,* JOLLY and HIGGINBOTHAM, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 The dispositive question in these consolidated appeals is whether state laws proscribing deceptive advertising are preempted by federal law when the state attempts to enforce such laws against the advertising of fares by interstate and international airlines. Three separate appeals were consolidated for oral argument. We refer to the cases by their Court of Appeals numbers.
 
 
 2
 In number 89-1142, the Defendant-Appellant is Jim Mattox, the Attorney General of Texas. The Plaintiffs-Appellees are Trans World Airlines, Inc. (TWA), Continental Airlines, Inc. (Continental) and British Airways, PLC (British Air).
 
 
 3
 In numbers 89-1509 and 89-1610, the Defendants-Appellants are the attorneys general of Texas and thirty-three other states. The Plaintiffs-Appellees are TWA, Continental, British Air, Pan American World Airways, Inc. (Pan Am) and ten other airlines.
 
 
 4
 We affirm the orders appealed from in each of the three appeals.
 
 I. Background
 A. History of Proceedings
 Number 89-1142:
 
 5
 In December 1987, the National Association of Attorneys General (NAAG) adopted guidelines related to airline advertising. The guidelines provide that any fuel, tax or other surcharge to air fare must be included in the total advertised price of the fare. The guidelines are not law.
 
 
 6
 On November 14, 1988, the attorneys general of Texas and four other states sent letters to TWA, Continental and British Air, notifying them that some of their advertisements violated the NAAG guidelines and these states' false advertising and deceptive practices laws. The letters charged that the airlines had attempted to make their fares appear lower than those of their competitors by prominently advertising the ticket price, while less prominently disclosing taxes, surcharges and fees.
 
 
 7
 In particular the Attorney General of Texas stated that the airlines had violated the Texas Deceptive Trade Practices Act. The Attorney General advised the airlines that advertising a specific amount for a fare was deceptive if the advertised amount did not reflect the true cost of travel because certain surcharges had not been included in the advertised fare. The letter threatened prosecution.
 
 
 8
 In January 1989, TWA, Continental and British Air filed suit in the United States District Court for the Western District of Texas to enjoin the Attorney General of Texas from enforcing the Texas Deceptive Trade Practices Act against their advertising. Following a hearing, the district court granted a preliminary injunction. 712 F.Supp. 99. The court found it probable that the plaintiffs would prevail in establishing their claims that any state regulation of advertising related to the airlines' rates, routes and services had been preempted by federal law. The injunction forbade the Attorney General of Texas and all other persons acting in concert with him from initiating any enforcement action under state law, "which would seek to regulate or restrict any aspect of the individually named plaintiff airlines' air fare advertising or the operations involving their rates, routes and/or services." The district court later clarified its injunction by stating that it applied only to the Attorney General of Texas and to the laws of Texas. In number 89-1142, the Attorney General of Texas appeals from the order granting the preliminary injunction.
 
 Number 89-1509:
 
 9
 On March 16, 1989, the plaintiffs TWA, Continental and British Air filed a motion to broaden the preliminary injunction to include the attorneys general of thirty-three other states who had adopted the NAAG guidelines on airline advertising and who had appeared in a hearing in number 89-1142.
 
 
 10
 On April 27, 1989, the district court issued an order granting the motions of ten other airlines to intervene as plaintiffs. The court also granted the plaintiffs permission to amend their complaint to add as defendants the attorneys general of the thirty-three other states who had appeared in the action. The court then broadened the preliminary injunction to include the attorneys general of the other thirty-three states.
 
 
 11
 The district court noted that since the injunction had been issued on January 30, 1989, against the Attorney General of Texas, suits had been filed by the Attorneys General of California, Kansas and New York against TWA seeking to force the airline to comply with state laws concerning advertising. Also, the Attorney General of Texas had filed a similar suit against Pan Am. The broadened injunction acted prospectively and did not affect these pending state court cases against TWA and Pan Am. The thirty-four attorneys general appeal this broadening order in number 89-1509.
 
 Number 89-1610:
 
 12
 After the Attorney General of Texas sued Pan Am in state court, charging deceptive practices, Pan Am removed the case to the United States District Court for the Northern District of Texas. Attorney General Mattox objected to removal to federal court and moved to remand the case to state court. His motion was denied. This case was then transferred to the United States District Court for the Western District of Texas. On May 30, 1989, the District Court for the Western District consolidated this removed case with number 89-1509. The court issued an order granting Pan Am's motion to intervene in number 89-1142 and broadening the preliminary injunction to include Pan Am among the airlines against whom the enjoined states could take no new action. The thirty-four state attorneys general appeal this order of the district court in number 89-1610.
 
 
 13
 B. Brief Overview of Federal Regulation (and Deregulation)
 
 
 14
 The framework for federal regulation of civil aviation was set forth in the Civil Aeronautics Act of 1938, Ch. 601, 52 Stat. 973 (1938). This statute created the Civil Aeronautics Authority, whose name was changed to the Civil Aeronautics Board (CAB) in 1940, and vested it with broad powers to regulate commercial aviation. Included in that portion of the statute dealing with economic regulation was section 411, which gave the Authority the power to determine if any carrier engaged in unfair or deceptive practices or unfair methods of competition. Id. at 1003. The statute also contained a savings clause in section 1106, which stated that nothing contained in the Act would "abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies." Id. at 1027.
 
 
 15
 The Federal Aviation Act of 1958, Pub.L. No. 85-726, 72 Stat. 731 (1958) (the Act), continued the CAB and created the Federal Aviation Agency (FAA). The Act reenacted section 411 as it appeared in the Civil Aeronautics Act of 1938, except for substitution of "Board" for "Authority." It also reenacted section 1106, which provided that other common law and statutory remedies remained viable.
 
 
 16
 Congress enacted the Airline Deregulation Act in 1978. Pub.L. No. 95-504, 92 Stat. 1705 (1978) (Deregulation Act). The purpose of this statute was to encourage and develop an air transportation system that "relies on competitive market forces to determine the quality, variety, and price of air services." Id. The Deregulation Act directed the CAB to consider a number of factors to be in the public interest, including "[t]he prevention of unfair, deceptive, predatory, or anti-competitive practices in air transportation." Id. at 1706. The Deregulation Act did not change sections 411 or 1106 of the existing statute, but did add a federal preemption provision. Section 105 stated that "no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." Id. at 1707-08.
 
 
 17
 The House Committee on Public Works and Transportation noted that "[e]xisting law contains no specific provision on the jurisdiction of the States and the Federal Government over airlines which provide both intrastate and interstate service. The lack of specific provisions has created uncertainties and conflicts...." H.R.Rep. No. 1211, 95th Cong., 2d Sess. 15-16 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 3737, 3751-52. The Committee intended section 105 to "prevent conflicts and inconsistent regulations by providing that when a carrier operates under authority granted pursuant to title IV of the Federal Aviation Act, no State may regulate that carrier's routes, rates or services." H.R.Rep. No. 1211 at 16; 1978 U.S.Code Cong. & Admin.News at 3752.
 
 
 18
 The Deregulation Act also contained "sunset provisions" terminating some of the CAB's authority and transferring some authority to the Department of Transportation (DOT) and other federal departments. The sunset provisions neither terminated nor transferred the CAB's authority under section 411.
 
 
 19
 In 1980, Congress amended section 102 of the Act by adding a more comprehensive treatment of matters to be considered in the public interest. This treatment contains a new emphasis on "maximum reliance on competitive market forces and on actual and potential competition" to achieve the goals of safe, efficient and economic air transportation. Pub.L. No. 96-192, 94 Stat. 35 (1980). However, since 1938 it has been in the public interest for the CAB to promote adequate, economical and efficient air service without unfair or destructive competitive practices. 52 Stat. 980; 49 U.S.C.App. Sec. 1302(a)(3). And, since 1978 "the prevention of unfair, deceptive, predatory or anticompetitive practices" has been in the public interest. 92 Stat. 1706; 49 U.S.C.App. Sec. 1302(a)(7).
 
 
 20
 Finally, Congress enacted the Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 1703 (1984) (Sunset Act). This law terminated or transferred the remaining functions of the CAB and provided for its demise. Sections 411 and 1106 of the original Act were neither terminated nor transferred. However, the Sunset Act contained a provision that all authority of the CAB neither terminated on or before January 1, 1985, nor otherwise transferred, was transferred by law to DOT. Id. at 1704. The Sunset Act made no material changes in sections 105 and 411, the preemption provision and the section dealing with "unfair or deceptive practices or unfair methods of competition," respectively. They are codified now as 49 U.S.C.App. Secs. 1305 and 1381. Section 12 of the Sunset Act added savings provisions that continued in effect all rules, regulations, orders and determinations of the CAB and gave the same authority as held by the CAB to any agency to which CAB functions were transferred. These provisions are codified now as 49 U.S.C.App. Sec. 1556. It also retained section 1106, now codified as 49 U.S.C.App. Sec. 1506.
 
 
 21
 The House Committee on Public Works and Transportation noted that there was a need to clarify the status of some of the CAB's authority after sunset. H.R.Rep. No. 793, 98th Cong., 2d Sess. 1, 3 (1984), reprinted in 1984. U.S.Code Cong. & Admin.News 2857, 2859. The sunset provisions of the 1978 Deregulation Act did not deal with the authority to protect consumers and to prevent unfair competitive practices. H.R.Rep. No. 793 at 3; 1984 U.S.Code Cong. & Admin.News at 2859. The Committee concluded that this important authority should be continued and should be exercised by DOT. H.R.Rep. No. 793 at 4-6; 1984 U.S.Code Cong. & Admin.News at 2860-62. The following passages in the report are of particular interest:
 
 
 22
 In addition to protecting consumers, federal regulation insures a uniform system of regulation and preempts regulation by the states. If there was no Federal regulation, the states might begin to regulate these areas, and the regulations could vary from state to state. This would be confusing and burdensome to airline passengers, as well as to the airlines.
 
 
 23
 H.R.Rep. No. 793 at 4; 1984 U.S.Code Cong. & Admin.News at 2860.
 
 
 24
 The Committee has determined that the Department of Transportation is the most appropriate agency to administer CAB's consumer protection and unfair competitive practice authorities. Under the ADA, DOT will get CAB's authority to protect consumers and competitors insofar as international aviation and essential air service (EAS) are involved, and it would be confusing and inefficient to have DOT protect consumers and carriers in international and EAS operations, and another agency, such as FTC, protect consumers and carriers in other domestic operations. Airline flights frequently are not limited to one of these categories. Some airline flights provide both essential air transportation and other domestic transportation and other flights provide both domestic and international service. If two agencies shared authority for consumer protection, the rules could shift in mid-flight.
 
 
 25
 H.R.Rep. No. 793 at 6; 1984 U.S.Code Cong. & Admin.News at 2862. The concerns expressed by the Committee with respect to divided authority by more than one federal agency would appear equally valid with respect to a division of authority between the federal government and the states.
 
 II
 
 26
 The Supreme Court has considered claims of preemption in many contexts, and has developed an analytical framework for deciding such claims. The Court recently wrote:
 
 
 27
 The circumstances in which federal law pre-empts state regulation are familiar. See Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n, 461 U.S. 375, 383 [103 S.Ct. 1905, 1912, 76 L.Ed.2d 1] (1983). See also Fidelity Federal Savings & Loan Assn. v. De la Cuesta, 458 U.S. 141, 152-154 [102 S.Ct. 3014, 3022-3023, 73 L.Ed.2d 664] (1982). A pre-emption question requires an examination of congressional intent. Id., at 152 [102 S.Ct., at 3022]. Of course, Congress explicitly may define the extent to which its enactments pre-empt state law. See, e.g., Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95-96 [103 S.Ct. 2890, 2898-2899, 77 L.Ed.2d 490] (1983). In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found " 'when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, Hines v. Davidowitz, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).' " California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 581 [107 S.Ct. 1419, 1425, 94 L.Ed.2d 577] (1987), quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 [104 S.Ct. 615, 621, 78 L.Ed.2d 443].
 
 
 28
 Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299-300, 108 S.Ct. 1145, 1150-1151, 99 L.Ed.2d 316 (1988). See also, Chrysler Corp. v. Texas Motor Vehicle Comm'n, 755 F.2d 1192, 1205 (5th Cir.1985).
 
 
 29
 We look first to see if state laws pertaining to deceptive advertising have been expressly preempted by federal law when applied to fare advertising by interstate and international airlines. It will be necessary to consider preemption by implication only if we find no express preemption.
 
 A.
 
 30
 The airlines contend that section 105(a)(1) of the Act expressly preempts state laws pertaining to the advertising of fares by airlines. Section 105, as noted, was added to the Act in 1978 by the Deregulation Act. Section 105(a)(1), states:
 
 
 31
 (a) Preemption
 
 
 32
 (1) Except as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide interstate air transportation.
 
 
 33
 49 U.S.C.App. Sec. 1305(a)(1) (1988). The exception in paragraph (2), referred to in the quoted text, has no application to this case.
 
 
 34
 The Attorney General of Texas, joined by the other state attorneys general in their briefs, argues that the state has the power to regulate the deceptive advertising of fares by airlines, and that federal law does not preempt his right to enforce state law. He contends that section 105 only preempts state regulations relating to the rates, routes or services of airlines, but does not expressly preclude state regulations relating to all airline operations. He maintains that state regulation of deceptive fare advertising by airlines does not relate to rates, routes or services. Attorney General Mattox argues that the legislative history of section 105 does not indicate congressional intent to preempt state regulation of deceptive fare advertising by airlines. Such regulation by the states protects the competitive functioning of the market place, he contends, and was not within the scope of state regulations that Congress intended to preempt.
 
 
 35
 The airlines respond that section 105 preemption applies to all laws "relating to rates, routes, or services" of airlines, and that the advertising of fares by airlines clearly relates to rates. Thus, the airlines argue that the district court correctly enjoined the state attorneys general from enforcing the various state laws. In addition, they note that section 411 of the Act, 49 U.S.C.App. Sec. 1381, empowers DOT to regulate "unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof."
 
 B.
 
 36
 In our discussion we refer to the sections of the Act by their presently codified numbers. We conclude that state laws proscribing deceptive advertising are preempted by Sec. 1305(a)(1) when a state attempts to enforce such laws against the advertising of fares by interstate and international airlines. Neither the Supreme Court nor any court of appeals has decided this precise issue. Two courts of appeals, however, have found express preemption of certain aspects of airline operations. See Illinois Corporate Travel v. American Airlines, 889 F.2d 751 (7th Cir.1989) and New England Legal Foundation v. Massachusetts Port Auth., 883 F.2d 157 (1st Cir.1989). These courts of appeals have particularly relied upon the Supreme Court's construction of section 514(a) of the Employee Retirement Income Security Act of 1974 (ERISA) which preempts all state laws "insofar as they ... relate to any employee benefit plan." Shaw v. Delta Air Lines, 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). In Shaw the Court concluded that Congress used "relate to" in the broad sense and that any law " 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Id. at 96-98, 103 S.Ct. at 2899-2901.
 
 
 37
 Illinois Corporate Travel was an action brought by a travel agent against American Airlines, in which the travel agent asserted a federal antitrust claim and three state law claims. One of the state law claims was based on the Illinois Consumer Fraud and Deceptive Business Practices Act, and the others were based on common law. 889 F.2d at 752, 754. The travel agent had advertised that it offered discounts on American's tickets, and American attempted to stop such discount price advertising by denying the travel agent access to the plate used to issue tickets for the airline and by informing other airlines that it would not accept tickets that the travel agent wrote using their plates. American also issued an addendum to the agreement all travel agents must sign forbidding those selling its tickets to advertise that they offer discounts. Id. at 752.
 
 
 38
 The Seventh Circuit affirmed the district court's decision to dismiss two of the state law claims because they were preempted by Sec. 1305(a)(1). Noting the Supreme Court's observations in Shaw, the court stated, "Price advertising surely 'relates to' price; the 'relating to' language in Sec. 1305(a)(1) substantially increases the extent of preemption." Id. at 754. The court also disposed of the travel agent's argument that the language in Sec. 1506 (the "savings clause") preserved the state law claim. The court held that this section preserves state law claims from implicit preemption, but not from express preemption. If a state law relates to "rates, routes, or services," it is preempted; "the absence of contrary federal law is irrelevant." Id.
 
 
 39
 In New England Legal Foundation, the court of appeals reversed a district court decision that the state authority could enact a landing fee scheme that created great disparity between user fees charged smaller and larger aircraft. 883 F.2d at 175. There were many issues in the case, but its outcome turned on the determination of DOT's role after deregulation and the application of Sec. 1305(a)(1). Administrative proceedings were begun before an ALJ prior to institution of the district court action. DOT and the district court reached contrary conclusions concerning the validity of the landing fee scheme. Id. at 171.
 
 
 40
 The court of appeals concluded that DOT had primary jurisdiction and that the district court should have deferred to DOT's interpretation of Sec. 1305(a)(1). The court noted that the CAB's regulatory responsibilities that survived deregulation were assigned to DOT, and stated:
 
 
 41
 In reducing federal economic regulation of the field to allow the forces of free competition to rule the marketplace, Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation. Congress expressly preempted state and local regulation by enacting Sec. 105(a), which specifically provides that "no state or political subdivision thereof ... shall enact or enforce any law, rule, regulation, standard, or other provision ... relating to rates, routes, or services of any air carrier...." 49 U.S.C.App. Sec. 1305(a).
 
 
 42
 Id. at 173. The court concluded that the landing fee scheme was preempted by Sec. 1305(a)(1). Id. at 175.
 
 
 43
 In addition, without referring to Shaw, this court and other courts of appeals have found express preemption under Sec. 1305(a)(1).
 
 
 44
 This court concluded in O'Carroll v. American Airlines, 863 F.2d 11 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989) that Sec. 1305(a)(1) preempted state law claims for damages by a passenger who was excluded from a flight after creating a disturbance on a plane. The court found that this section expressly preempted the state laws relied upon by the plaintiff, thus making consideration of implied preemption unnecessary. Id. at 13.
 
 
 45
 Two courts have found that Sec. 1305(a)(1) preempted state laws concerning the treatment of handicapped passengers. In Hingson v. Pacific Southwest Airlines, 743 F.2d 1408 (9th Cir.1984), the court of appeals affirmed a directed verdict for the airline on a blind passenger's state law claims for discrimination in seating. The court found that state anti-discrimination laws were preempted as "relating to" services within the meaning of Sec. 1305(a)(1). Id. at 1415. Accord Anderson v. USAir, 818 F.2d 49 (D.C.Cir.1987).
 
 C.
 
 46
 The attorneys general cite three recent decisions by federal district courts concerning state regulation of the advertising of fares by airlines: New York v. Trans World Airlines, 728 F.Supp. 162 (S.D.N.Y.1989); California v. Trans World Airlines, 720 F.Supp. 826 (S.D.Cal.1989); and Kansas v. Trans World Airlines, 730 F.Supp. 366 (D.Kan.1990). In each case, the state attorney general filed a state court suit against the airline, alleging that the airline's advertising of fares violated state deceptive practices laws. The airline removed the case to federal court. Then, the attorney general moved to remand the action to state court, and the district court granted the motion.
 
 
 47
 In New York, the court found that Sec. 1305(a)(1) does not expressly preempt the State's enforcement of its deceptive practice laws concerning airline advertising. 728 F.Supp. at 176. The court concluded that any relationship between New York's enforcement of its laws against deceptive advertising and an airline's rates, routes and services is remote and indirect. Id. at 176. The court expressed concern that a finding that Sec. 1305(a)(1) preempted New York law might "doom every state regulation affecting airlines." Id. at 176.
 
 
 48
 The district court in California made the following observation:
 
 
 49
 In the instant case, plaintiff [state attorney general] could not bring an action under the Federal Aviation Act or its counterparts to enjoin the alleged false advertising. It appears from the statute that only the Administrator of the FAA may institute a civil action against an airline for a violation of the statute. See 49 U.S.C.A.App. Sec. 1471. In fact, the whole contention of defendant [airline] is that the Department of Transportation (DOT) has sole authority to enforce alleged unfair advertising. Assuming arguendo that state regulation of airline advertising were preempted, since the Federal Aviation Act gives plaintiff no cause of action, plaintiff may bring a suit to enforce its alleged right in state court, and such a case "arises under" state law only. See Franchise Tax Board, [v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ], supra.
 
 
 50
 California, 720 F.Supp. at 828.
 
 In Kansas, the court found:
 
 51
 TWA has not met its burden of demonstrating clear congressional intent to make cases such as the present one removable. The court finds that the language of the preemption section precluding state regulation "relating to rates, routes or services" does not by its terms include advertising. [Citation omitted]. The Court accordingly finds that the Act does not provide a basis for removal under the "complete preemption" exception to the well-pleaded complaint rule. [Citation omitted].
 
 
 52
 Kansas, 730 F.Supp. at 368.
 
 
 53
 In addition, the attorneys general rely on People v. Western Airlines, 155 Cal.App.3d 597, 202 Cal.Rptr. 237 (Cal.Ct.App.1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 808 (1985). There the court noted that Congress had granted the CAB broad authority to regulate unfair competition and deceptive practices by airlines, but the court concluded that there was no inherent conflict between this authority and California's enforcement of its false advertising laws against interstate air carriers. 202 Cal.Rptr. at 238-39. This decision appears to turn on a finding of no implied preemption, rather than an examination of Sec. 1305 to determine whether Congress had expressly preempted the state law action.
 
 
 54
 Also, the attorneys general cite Nader v. Allegheny Airlines, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), in which the Court held that a common-law tort action for fraudulent misrepresentation was not preempted by reason of the CAB's authority over "deceptive practices" under Sec. 1381. However, Nader was decided prior to the addition of Sec. 1305 to the Act. Thus, there was no basis for a finding of express preemption at the time of the decision.
 
 D.
 
 55
 Unlike the district courts in New York, California and Kansas, we believe the history of federal legislation regulating airlines demonstrates the intent of Congress to expressly preempt state regulation of airline fare advertising, leaving no right of action that arises under state law only. See discussion of remand in relation to Pan Am in Part V, infra. From the Civil Aeronautics Act of 1938 until the Deregulation Act of 1978, Congress gave the CAB vast powers of economic regulation over the airline industry, including the regulation of rates, routes and services. See 52 Stat. 973 (1938); 72 Stat. 731 (1958); 92 Stat. 1705 (1978). The Deregulation Act restricted the CAB's authority to regulate some of these areas. In changing the longstanding role of the CAB, Congress acknowledged that these changes could cause confusion concerning federal and state roles in airline regulation. Specifically, the House Committee on Public Works and Transportation observed that the Deregulation Act lacked specific provisions concerning state and federal jurisdiction over airlines, and thereby created "uncertainties and conflicts" in this regard. H.R.Rep. No. 1211 at 15-16; 1978 U.S.Code Cong. & Admin.News at 3751. By including Sec. 1305 in the Deregulation Act to preempt state regulation of airline routes, rates or services, Congress hoped to "prevent conflicts and inconsistent regulations." H.R.Rep. No. 1211 at 16; 1978 U.S.Code & Cong. & Admin.News at 3752.
 
 
 56
 Subsequent legislation has confirmed the intent of Congress to preempt state regulation of airline fare advertising. Since the enactment of the Deregulation Act, Congress has retained Sec. 1305. Through the Sunset Act of 1984, Congress transferred to DOT the CAB's power to control unfair or deceptive trade practices under Sec. 1381. 49 U.S.C.App. Sec. 1551(b)(1)(E). In so doing, Congress intended to protect consumers by providing a uniform system of federal regulation of unfair or deceptive practices by airlines. The House Committee on Public Works and Transportation stated that "federal regulation insures a uniform system of regulation and preempts regulation by the states. If there was no federal regulation, the states might begin to regulate these areas, and the regulations could vary from state to state. This would be confusing and burdensome to airline passengers, as well as to the airlines." H.R.Rep. No. 793 at 4; 1984 U.S.Code Cong. & Admin.News at 2860.
 
 
 57
 Given the history of congressional concern and the inclusion of specific preemption language in the Deregulation Act, we agree with the Seventh Circuit in Illinois Corporate Travel that airline fare advertising "relates to" rates within the meaning of Sec. 1305(a)(1). Although the state laws against deceptive advertising are not aimed specifically at airlines, and clearly do not attempt to set rates, the conclusion is inescapable that such laws do "relate to" rates when applied to airline fare advertising. As the Supreme Court noted in Shaw, a law relates to a particular subject "if it has a connection with or reference to" that subject. 463 U.S. at 96-97, 103 S.Ct. at 2899-2900. It cannot be gainsaid that enforcement of a state law regulating fare advertising by airlines has a connection with or reference to rates within the meaning of Sec. 1305(a)(1). Therefore, such state action is expressly preempted by Sec. 1305(a)(1).
 
 
 58
 The attorneys general remind us that Sec. 1506, which preserves remedies that exist at common law and by state statute, also survived the Sunset Act. They contend that this provision enables them to enforce their states' deceptive advertising laws as an additional remedy to those provided by the Act. However, in a case involving the express preemption of airline services, this court found that Sec. 1305 clearly indicated congressional intent to preempt and controlled over a state law claim submitted under Sec. 1506. O'Carroll, 863 F.2d at 13. In the present case involving the advertising of fares by airlines, we follow the reasoning in O'Carroll and agree with the Seventh Circuit in Illinois Corporate Travel; Sec. 1506 does not preserve state law remedies when there is express preemption under Sec. 1305. See Hingson, 743 F.2d at 1416 n. 11.
 
 
 59
 In summary, we believe it is clear that by enacting Sec. 1305 Congress intended to retain in the federal government, exclusive authority over airline advertising of fares. It is not as though Congress had left a vacuum which the states needed to fill in order to protect their citizens. The provisions of the Act under which the CAB regulated unfair or deceptive practices of airlines, particularly Sec. 1381, were neither terminated nor transferred to other agencies; they were transferred by operation of law to DOT. Thus, DOT inherited the CAB's role under Sec. 1381 with respect to unfair and deceptive practices. With the advent of deregulation and the demise of the CAB, Congress continued to vest authority over such practices in a federal agency. Congress provided for its concern that consumers of airline services be protected under a uniform system of regulation by adding Sec. 1305. This express preemption provision was intended "to prevent conflicts and inconsistent regulations" concerning airline advertising of fares, which relates to rates within the meaning of the provision.
 
 
 60
 Having concluded that Sec. 1305(a)(1) expressly preempts state deceptive advertising laws as applied to airline fare advertising, we do not reach the parties' arguments concerning implied preemption.
 
 III.
 
 61
 The attorneys general also argue that the airlines failed to meet the burden of proving the requirements for granting a preliminary injunction and, therefore, the district court abused its discretion by issuing the preliminary injunction against enforcement of the various state laws. As we have indicated, enforcement actions by the states are preempted; thus, the airlines have demonstrated a substantial likelihood of success on their claim for a permanent injunction. Likelihood of success is the first requirement for granting a preliminary injunction. The other three requirements are: (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the one seeking the injunction outweighs any damage it may cause the other party; and (4) that the injunction will not be against the public interest. Plains Cotton Coop. Ass'n v. Goodpasture Computer Service, 807 F.2d 1256, 1259 (5th Cir.), cert. denied, 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987). Under the facts of this case we believe the finding with respect to likelihood of success carries with it a determination that the other three requirements have been satisfied.
 
 
 62
 Congress has exercised its authority under the Commerce Clause to regulate airlines and by adopting Sec. 1305 has chosen to preempt all enforcement of state laws relating to rates, routes or services of airlines. Congress has declared that it is in the public interest for a federal agency to guard against unfair or deceptive practices by airlines. If the states were permitted to enforce their various laws, the airlines would be subjected to the demands and criteria of numerous legislatures rather than being required to comply only with federal laws and regulations. This would cause irreparable injury by depriving the airlines of a federally created right to have only one regulator in matters pertaining to rates, routes and services. The appellants miss the thrust of the airlines' argument by contending that the only threatened injury is a loss of revenue, which is not irreparable. We conclude that permitting states to regulate airline advertising in the face of the preemption language of Sec. 1305(a)(1) would violate the Supremacy Clause, causing irreparable injury to the airlines. Therefore, the second requirement for an injunction is satisfied.
 
 
 63
 With regard to the third requirement, there is no injury to the states to weigh against that which they threaten to inflict on the airlines. Since Congress expressly preempted this area of regulation, the states are not injured by the injunction.
 
 
 64
 Finally, the fourth requirement is satisfied by the finding of Congress that exclusive federal regulation in matters relating to airline rates, routes or services is in the public interest.
 
 
 65
 We conclude that the airlines met their burden of proving the four requirements and the district court properly issued the preliminary injunction.
 
 IV.
 
 66
 In number 89-1509 the attorneys general of thirty-three states[1] appeal from the order of the district court broadening the preliminary injunction to include them and permitting the airlines to name and serve them as additional defendants in the pending action against the Attorney General of Texas. The Attorney General of Texas also appeals from this order.
 
 A.
 
 67
 A brief outline of the background and participation of these attorneys general in the TWA v. Mattox litigation is in order.
 
 
 68
 In June 1987, as a result of a resolution co-authored by the Attorney General of Texas, the NAAG appointed a task force to study the advertising and marketing practices of the airline industry in the United States.
 
 
 69
 In a letter dated October 19, 1987, DOT informed the Attorney General of California that a number of the proposed NAAG guidelines concerning airline advertising appeared to be preempted by federal law.
 
 
 70
 In December 1987, the NAAG adopted the guidelines. On February 3, 1988, the attorneys general of Texas and six other states wrote several airlines threatening "protracted litigation" to bring their advertisements into compliance with the guidelines. In a March 2, 1988, letter from DOT to the Attorney General of Texas, DOT stated that state regulation of fare advertising by airlines, as set forth in the guidelines, was preempted by federal law.
 
 
 71
 On November 14, 1988, the Attorney General of Texas sent a letter to Plaintiffs TWA, Continental and British Air on behalf of the states of California, Massachusetts, New York, Texas and Washington. The letter stated that it was the position of the states that any fuel tax or other surcharge to air fare must be included in the total advertised price. The attorneys general indicated an intent to sue the airlines under their respective state laws.
 
 
 72
 TWA, Continental and British Air commenced this action against the Attorney General of Texas on January 23, 1989, and moved for a temporary restraining order (TRO). On January 24, 1989, the Attorney General of Texas notified four states of the suit and advised them that the suit could restrict all states from enforcing their laws against airlines. Other states were also informed.
 
 
 73
 On January 27, 1989, the date of the hearing on the TRO, thirty-three states filed a motion, which reads in pertinent part:
 
 
 74
 Motion of Specially Appearing States to Deny Plaintiffs' Motion for Temporary Restraining Order or in the Alternative Motion to Extend Date for Hearing on Temporary Order
 
 
 75
 Without admitting or submitting to the subject matter jurisdiction of this Court and without admitting that this Court has personal jurisdiction over them, the states of Kansas, Alaska, ... Wyoming specially appear before this Court to move for an order denying the plaintiffs' motion for a temporary restraining order or in the alternative to ask this Court to set a future date upon which to hear plaintiffs' motion as a noticed motion for temporary restraining order.
 
 
 76
 The attorneys general stated in their motion that they had been "informed" that the airlines were seeking a TRO "that could have the effect of prohibiting such states from enforcing their own laws even though they were not named as defendants nor served by plaintiffs with a copy of the action currently before this Court."
 
 
 77
 The Attorney General of Kansas then participated in the TRO hearing. After the Assistant Attorney General of Texas had argued against entry of a TRO, the Attorney General of Kansas addressed the court. He stated that he appeared for the purpose of responding on behalf of thirty-four state attorneys general. He argued that the other attorneys general were not responsible for the individual actions of the states of Texas and Kansas under those states' consumer protection laws--attorneys general cannot act in concert with one another except to the extent their laws are similar. He argued that since each state acted individually to enforce its laws, the states could not be sued collectively "unless there's something that would bring the state under the umbrella of some kind of federal action. And states don't set rates, rules and regulations.... The bottom line ... is that individual states should not be precluded in advance as they consider enforcement of their state law in their state court."
 
 
 78
 The district court denied motions to stay and on January 30, 1989, issued the preliminary injunction prohibiting the Attorney General of Texas from initiating any enforcement action to regulate the advertising of fares by TWA, Continental or British Air. Attorney General Mattox appealed on February 10, 1989 (No. 89-1142). On February 14, 1989, the Attorney General of Kansas filed a motion to clarify the injunctive order. He requested the court to enter a "Substituted Order," which he attached to the motion. On February 27, 1989, the district court entered an order granting the Kansas motion. It stated:
 
 
 79
 The Court's Order of January 30, 1989 does not apply to any Attorney General of any state, commonwealth, territory, or the District of Columbia, other than Jim Mattox, Attorney General of Texas, nor does that order apply to any law other than the laws of the State of Texas.
 
 
 80
 On March 16, 1989, TWA, Continental and British Air filed a motion to broaden the preliminary injunction to include the attorneys general of thirty-three other states who had adopted the NAAG guidelines on airline advertising and who "specially appeared" in the TRO hearing in January. On March 29, 1989, ten additional airlines filed a motion for leave to intervene. Copies of the motions to broaden the preliminary injunction and to permit additional airlines to intervene were sent to the Attorneys General of Texas and Kansas. Neither motion was served on any of the attorneys general of the other thirty-two states.
 
 
 81
 On April 4, 1989, the Attorney General of Kansas filed a response denying that the district court had subject matter or personal jurisdiction over him.
 
 
 82
 On April 27, 1989, the district court filed an order broadening the preliminary injunction to include the attorneys general of the other thirty-three states. Also, the court granted the motions of the ten other airlines to intervene as plaintiffs.
 
 
 83
 The district court noted that since the injunction was issued on January 30, 1989, against the Attorney General of Texas, suits had been filed by the Attorneys General of California, Kansas and New York against TWA seeking to force the airline to comply with state laws concerning advertising. Also, the Attorney General of Texas had filed a similar suit against Pan Am.
 
 
 84
 The district court granted the plaintiffs leave to amend their complaint to include those attorneys general who, acting in concert with Attorney General Mattox or among themselves, were attempting to use state law to enforce the NAAG guidelines relating to airline advertising. This injunction operates prospectively and does not act to interfere with the four cases mentioned above.
 
 B.
 
 85
 Unlike subject matter jurisdiction, jurisdiction over the person can be waived. Cactus Pipe & Supply Co. v. M/V Montmartre, 756 F.2d 1103, 1107 (5th Cir.1985). The Cactus Pipe court adopted the following statement made in Grammenos v. Lemos, 457 F.2d 1067, 1070 (2d Cir.1972), "If a party enters a case, makes no objection to jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection." Cactus Pipe, 756 F.2d at 1108. In Rauch v. Day & Night Mfg. Corp., the court stated that a court can acquire jurisdiction over a nonresident only by actual service within the jurisdiction "or by his waiver, by general appearance or otherwise, of the want of due service." 576 F.2d 697, 700 (6th Cir.1978) (quoting Goldey v. Morning News, 156 U.S. 518, 521, 15 S.Ct. 559, 560, 39 L.Ed. 517 (1895)) (emphasis in original).
 
 
 86
 In the present case the plaintiffs filed suit only against the Attorney General of Texas. Although they sought a TRO against the defendant and "any person in active concert or participation with him," the only relief prayed was from enforcement actions "under the laws of the state of Texas." The complaint and motion for an injunction did not seek to enjoin the enforcement of any laws but those of Texas. The other thirty-three attorneys general joined the Attorney General of Texas in asking the district court to deny the injunction. At that time, they had neither been named defendants nor served with process. They stated that they filed the motion because they had been informed, presumably by the Attorney General of Texas, that the plaintiffs were seeking an injunction that would interfere with the enforcement of their states' laws.
 
 
 87
 The record does not support this conclusion. The airlines' motion for a TRO referred to the actions of the NAAG in promulgating the guidelines, but sought relief only against Texas. Nevertheless, the attorneys general of thirty-three other states filed a motion asking the district court to deny the airlines' motion for a TRO against enforcement of Texas laws. Although they described themselves as "specially appearing," the attorneys general sought an affirmative act by the court that would benefit their states. The fact that they sought affirmative relief controls, not the form of their appearance, for the distinction between general and special appearances no longer exists in federal courts. A party may appear generally and yet object to personal jurisdiction at any time before the answer is filed or in the answer. Grammenos, 457 F.2d at 1070; Fed.R.Civ.P. 12(h). The thirty-three attorneys general were not parties, however, when they filed their motion. They had no basis for objecting to the court's jurisdiction as they had not been named defendants and no attempt had been made to bring them before the court by process.
 
 
 88
 It appears to us that the thirty-three attorneys general became de facto intervenors when the Attorney General of Kansas filed the motion, sought relief and participated in the TRO hearing on their behalf. At that point it was irrelevant that the thirty-three attorneys general had not been sued or served; they chose to take part in the pending action as if they were parties. True, they did not seek to intervene under Fed.R.Civ.P. 24. On the other hand, they did not appear as amici curiae. Without being required to do so, they came voluntarily into court and joined with the Attorney General of Texas in seeking dismissal of the injunctive action. The arguments made by the Attorney General of Kansas on behalf of Texas and the other thirty-three states went to the heart of the issue before the district court. We believe the thirty-three attorneys general waived any objection to the jurisdiction of the court over their persons as representatives of their respective states. Thus, we affirm the order broadening the preliminary injunction to include the attorneys general of the thirty-three states and permitting the plaintiffs to amend their complaint to name and serve those attorneys general as additional defendants.
 
 V.
 
 89
 In number 89-1610, the attorneys general of Texas and thirty-three other states appeal from the district court order that permitted the intervention of Pan Am as a plaintiff and broadened the scope of the preliminary injunction to include Pan Am. They argue that the complaint filed against Pan Am in state court by the Attorney General of Texas raised only state law issues and presented no federal question. As a result, the District Court for the Northern District of Texas lacked subject matter jurisdiction and erred in permitting removal, denying the Texas motion to remand to state court and transferring the case to the District Court for the Western District of Texas. They further assert that due to the lack of subject matter jurisdiction, the Western District erred in consolidating this action with that of TWA v. Mattox, granting Pan Am's motion to intervene as a plaintiff, and in broadening the preliminary injunction to include Pan Am.
 
 
 90
 Ordinarily, the existence of a federal question for removal purposes is determined according to the "well-pleaded complaint" rule. Under that rule, removal cannot be based on the existence of a federal defense. Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). As the Court noted in Taylor, however, Congress may so completely preempt a particular area, that "any civil complaint raising this select group of claims is necessarily federal in character." Id. at 63-64, 107 S.Ct. at 1546-1547. It has long been recognized that section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, has such preemptive force. In Taylor, the Court found that ERISA's preemption provision is similarly so strong that every claim for benefits under a covered plan is regarded as arising under the laws of the United States. This determination was based on "the clearly manifested intent of Congress." Id. at 67, 107 S.Ct. at 1548.
 
 
 91
 An examination of the preemption language in Sec. 1305(a)(1) and its legislative history leads to the conclusion that Congress did intend to preempt so completely the particular area of state laws "relating to rates, routes, or services" as to preclude state court actions. Congress preempted this area to maintain uniformity and to avoid the confusion and burdens that would result if interstate and international airlines were required to respond to standards of individual states. We agree with the First Circuit that Congress "did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation." New England Legal Foundation, 883 F.2d at 173. Congress made this clear by including the express preemption provision in the Deregulation Act. The legislative history of Sec. 1305 exhibits a congressional intent to treat a complaint raising "this select group of claims" as "necessarily federal in character." See Taylor, 481 U.S. at 63-64, 107 S.Ct. at 1546-1547. The complaint filed against Pan Am in state court by the Attorney General of Texas alleged that Pan Am had violated the Texas Deceptive Trade Practices Act through deceptive advertising of air fares. This claim relates to airline rates within the meaning of Sec. 1305(a)(1) and is federal in character; therefore, we conclude that there is federal question jurisdiction.
 
 
 92
 In addition, we conclude that the Western District properly permitted Pan Am to intervene as a plaintiff pursuant to Fed.R.Civ.P. 24(b)(2). Pan Am's defense that the enforcement action of the Attorney General of Texas under the Texas Deceptive Trade Practices Act is preempted by Sec. 1305(a)(1) presents a question of law in common with that relied upon by the other plaintiff airlines in this case.
 
 
 93
 Finally, we find that the Western District properly broadened the scope of the preliminary injunction to include Pan Am. However, this injunction operates prospectively and specifically states that the action by the Attorney General of Texas against Pan Am is excepted from the injunction. Therefore, the preliminary injunction does not enjoin the Attorney General of Texas from prosecuting this suit against Pan Am, but it does enjoin him and the attorneys general of the other thirty-three states from bringing similar suits against the airline.
 
 Conclusion
 
 94
 To summarize, we affirm the order of the district court in number 89-1142. The court issued a preliminary injunction that forbade the Attorney General of Texas and all other persons acting in concert with him from initiating any enforcement action under state law, which would seek to regulate the advertising of fares by plaintiffs TWA, Continental and British Air. The court later clarified this injunction by stating that it applied only to the Attorney General of Texas and to the laws of Texas.
 
 
 95
 In addition, we affirm the order of the district court in number 89-1509. Through this order, the court granted the motions of ten other airlines to intervene as plaintiffs. The court also granted plaintiffs TWA, Continental and British Air permission to amend their complaint and to add as defendants the attorneys general of thirty-three other states. And, the court broadened the preliminary injunction to include the attorneys general of the other thirty-three states. This broadened injunction operates prospectively and does not affect similar suits that had been filed by the Attorney General of Texas against Pan Am and the Attorneys General of California, Kansas and New York against TWA.
 
 
 96
 Finally, we affirm the order of the district court in number 89-1610. The court granted Pan Am's motion to intervene in number 89-1142 and broadened the preliminary injunction to include Pan Am among the airlines against whom the enjoined states could take no new action. The preliminary injunction operates prospectively and specifically states that the action by the Attorney General of Texas against Pan Am is excepted from the injunction. As a result, the injunction does not enjoin the Attorney General of Texas from prosecuting this suit against Pan Am, but it does enjoin him and the attorneys general of the other thirty-three states from bringing similar suits against the airline.
 
 
 97
 AFFIRMED.
 
 
 
 *
 Circuit Judge of the Sixth Circuit, sitting by designation
 
 
 [1]
 Kansas, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, Washington, West Virginia, Wisconsin and Wyoming